Slip Op. 13-112

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| GUANGXI JISHENG FOODS, INC., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant. | Before: Richard W. Goldberg, Senior Judge <br> Court No. 11-00378 <br><br> **PUBLIC VERSION** |

### OPINION AND ORDER

[Plaintiff's motion for judgment on the agency record is denied.]

Dated: August 23, 2013

*Yingchao Xiao*, Lee & Xiao, of San Marino, California, for plaintiff Guangxi Jisheng Foods, Inc.

*Richard P. Schroeder*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With him on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director. Of counsel on the brief was *Devin S. Sikes*, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

      Goldberg, Senior Judge: Plaintiff Guangxi Jisheng Foods, Inc. ("Jisheng") challenges the U.S. Department of Commerce's ("Commerce" or the "Department") decision to employ partial adverse facts available ("AFA") to complete some of Jisheng's factors of production ("FOP") data during the 2009–2010 administrative review of the antidumping duty order on Certain Preserved Mushrooms from the People's Republic of China. *See Certain Preserved Mushrooms from the People's Republic of China*, 76 Fed. Reg. 56,732 (Dep't Commerce Sept. 14, 2011) (final results of antidumping duty administrative review) ("*Final Results*"). For the reasons explained below, the court denies Jisheng's Motion for Judgment on the Agency Record and sustains the *Final Results* as they pertain to Jisheng.

## SUBJECT MATTER JURISDICTION AND STANDARD OF REVIEW

Jisheng commenced this action under 19 U.S.C. §§ 1516a(a)(2)(A)(i) and 1516a(a)(2)(B)(iii) (2006).  This Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and must uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence requires "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' taking into account the entire record, including whatever fairly detracts from the substantiality of the evidence."  *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Therefore, the Court asks whether Commerce adequately supported its conclusion, and not whether it would have reached the same conclusion upon independently reweighing the evidence.  *See Clearon Corp. v. United States*, Court No. 08-00364, 2011 WL 5909576, at *7 (CIT Nov. 18, 2011).  In assessing the reasonableness of Commerce's conclusion, this Court affords broad deference to Commerce's expert findings.  *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000) ("[F]actual determinations supporting anti-dumping margins are best left to the agency's expertise.").

The Court employs a two-part analysis to determine whether Commerce's statutory construction is otherwise "in accordance with law."  *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984); *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1359 (Fed. Cir. 2007).  The Court first asks whether Congress has directly spoken to the question at issue in the case.  *Chevron*, 467 U.S. at 842–43.  If it has, the Court gives effect to that unambiguously expressed intent.  *Id.*  If Congress has not, then the Court examines whether Commerce's interpretation "is based on a permissible construction of the statute."  *Id.* at 843.  To

satisfy that standard, Commerce need not provide "the *only* reasonable interpretation or even the *most* reasonable interpretation" of a statutory provision. *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1570 (Fed. Cir. 1994).

## **DISCUSSION**

In the underlying administrative review, Commerce applied partial AFA to complete Jisheng's FOP data for eight control numbers ("CONNUMs") and packing usage factors for one CONNUM. *See* Issues & Decision Memorandum, A-570-851 (Sept. 6, 2011) at 16–25 ("*I&D Mem.*"). Jisheng argues that the use of AFA with respect to all nine CONNUMs was unsupported by substantial evidence and otherwise not in accordance with law.

**I.   Background**

   **A.  Proceedings before Commerce**

Commerce compares normal value to an export price or constructed export price to determine a respondent's dumping margin. *See* 19 U.S.C. § 1675. In non-market economy ("NME") proceedings, Commerce constructs normal value "on the basis of the value of the factors of production utilized in producing the merchandise" plus "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." 19 U.S.C. § 1677b(c)(1)(B). Commerce solicits FOP information in Section D of the questionnaires that it sends to respondents.[1] Section C of Commerce's questionnaire, by contrast, "is designed to assist Commerce in determining the U.S. price against which normal value is compared." *Sidenor Indus. SL v. United States*, 33 CIT __, __, 664 F. Supp. 2d 1349, 1352 n.1 (2009).

---

[1] The information a respondent submits pertains to the "quantity of inputs actually used to produce the subject merchandise in the NME." *See* Dep't of Commerce, Antidumping Manual (Oct. 13, 2009), ch. 10 at 15. The Department then values the factors of production "based on the best available information regarding the values of such factors in a market economy country." 19 U.S.C. § 1677b(c)(1). The goal is to construct a hypothetical market value for a product. *See Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1375 (Fed. Cir. 1999).

In NME cases, responding to Sections C and D of Commerce's questionnaire results in two databases—the U.S. sales database and the FOP database, respectively. Entries in those databases are identified by CONNUM, and each CONNUM represents a unique product as defined by a series of characteristics that Commerce selects at the beginning of the proceeding. *See Union Steel v. United States*, 36 CIT __, __, 823 F. Supp. 2d 1346, 1349 (2012). For purposes of its margin calculations, Commerce requires that each CONNUM reported in the U.S. sales database have a corresponding match in the FOP database. *See, e.g.*, Dep't Commerce Standard NME Questionnaire at D-1.

In this case, Commerce's initial questionnaire directed Jisheng to report "factors information for *all* models or product types in the U.S. market sales listing submitted by you (or the exporter) in response to Section C of the questionnaire." Admin. R. Pub. Doc. ("P.R.") 36 at D-1. Jisheng responded by providing incomplete information for only a small portion of the CONNUMs in the U.S. sales database and no information whatsoever for the eight contested CONNUMs. Admin. R. Conf. Doc. ("C.R.") 12 at Ex. D-1 at 1, col. 1.

Commerce's first supplemental questionnaire again solicited the information, directing Jisheng to "[s]ubmit a separate record for each of the . . . control numbers (connums) you reported on your U.S. sales database" and to make certain amendments to the FOP data it already submitted. C.R. 19 at 6. Jisheng's response to that questionnaire contained FOP data for some, but not all, of the eight CONNUMs at issue. C.R. 24 at Ex. SD-1, col. 1 (containing data for [[     ]], [[     ]], [[     ]], [[     ]], and [[     ]]). Nonetheless, Commerce still perceived several flaws in Jisheng's September 2010 FOP data. *See* C.R. 32. Specifically, Commerce noted in its second supplemental questionnaire that the September 2010 database "contained numerous errors with respect to formatting and reporting methodology." *Id.* at 4.

Regarding formatting problems, Commerce explained that Jisheng failed to provide data for all the CONNUMs on one spreadsheet (and instead submitted separate spreadsheets for each CONNUM). *Id.* Additionally, for at least one of the CONNUMs at issue, Jisheng submitted duplicate spreadsheets with different figures on each spreadsheet. *Id.*; C.R. 24 at Ex. SD-1 (containing two entries for [[    ]] with different figures for fresh mushrooms ("FMUSH"), brined mushrooms ("BMUSH"), and salt ("SALT"), and with one product identified as a [[    ]] and another as a [[    ]]). Regarding substantive errors, Commerce drew Jisheng's attention to problems a petitioner detected with Jisheng's factor reporting. *See* C.R. 32 at 4 (referring to C.R. 26). Notably, with respect to [[    ]], Commerce did not know how Jisheng could report [[  ]] consumption of FMUSH and BMUSH when those inputs were seemingly necessary to produce subject merchandise. *See id.* at 6. Similarly, Commerce observed that Jisheng reported [[    ]] usage rates for FMUSH, BMUSH, SALT, and citric acid for [[    ]] and two other CONNUMs even though those CONNUMS were [[    ]]. *See id.* at 4; C.R. 26 at 9. This ran counter to Commerce's understanding that [[                                         ]].

Commerce directed Jisheng to correct the errors in a revised Section D database containing "data for each of the connums" in Jisheng's U.S. sales listing. C.R. 32 at 4. Jisheng's second supplemental questionnaire response contained no data for the eight contested CONNUMs. *See* C.R. 33 at Ex. SS-2, col. 1. Jisheng's third and fourth supplemental questionnaire responses were equally deficient. *See* C.R. 38 at Ex. SSS-3; C.R. 42 at Attach. B. Accordingly, Commerce preliminarily resorted to AFA to bridge the record gap caused by the absence of useable FOP data for eight CONNUMs. C.R. 45 at 5. As AFA, Commerce used the

highest normal value found for any CONNUM on Jisheng's FOP database. *Id.* Commerce continued to apply AFA in its final determination. *See I&D Mem.* at 16–25.

Commerce also applied AFA to another CONNUM in the FOP database lacking packing usage factors. *Id.* at 22–23. Commerce first notified Jisheng of the problem after Jisheng's September 2010 questionnaire response. C.R. 32 at 6. In that response, Jisheng reported [[                                         ]], for certain CONNUMs. C.R. 24 at Ex. SD-1. Responding to Commerce's request for clarification, Jisheng explained that it [[


]]. C.R. 33 at 7.

In its next supplemental questionnaire, Commerce elaborated that the "antidumping calculation methodology requires that a usage factor be attributed to each FOP of each connum regardless of whether that connum was packed but not shipped (or vice versa) during the POR." C.R. 36 at 5. To remedy the apparent information deficiency, Commerce instructed Jisheng to extend its reporting period for four CONNUMs to the twelve months preceding the period of review ("POR"). *Id.* Commerce also directed Jisheng to contact the Department "[i]f for any of these connums the above-described methodology still results in [[

]]." *Id.* Jisheng responded to the Department's request in January 2011 and February 2011, but never submitted packing costs for one CONNUM. Commerce applied AFA for that CONNUM in its *Final Results*, using the highest packing usage factors reported for any CONNUM in Jisheng's FOP database. *I&D Mem.* at 22–23.

### B. Supplemental briefing before the court

Jisheng timely appealed Commerce's determination. A review of the administrative record prompted the court to request supplemental briefing on the issue of the eight CONNUMs

allegedly absent from the FOP database. *See* Supp. Questions to Parties, ECF No. 46. Although Jisheng insisted that it provided FOP data for the eight contested CONNUMs, the court was unable to confirm Jisheng's assertion. The Government's brief added to the court's confusion since it asserted that "the universe of relevant United States sales that required [FOP] data was not established until Jisheng submitted a corrected [] United States sales database on November 16, 2010." Def.'s Opp'n to Pl.'s Mot. for J. on Agency R. ("Def.'s Br."), ECF No. 30, at 10. The November 16, 2010 U.S. sales database, though, did not contain the eight CONNUMs. It was unclear why Jisheng would be compelled to submit FOP data for CONNUMs that did not have corresponding U.S. sales.

The parties' responses to the supplemental questions partially mitigated the court's confusion. The Government explained that its reference to the November 2010 U.S. sales database was erroneous and that the January 2011 U.S. sales database established the final parameters for the FOP database. Def.'s Resp. to Supp. Questions, ECF Nos. 51–52. The Government confirmed that the November 2010 U.S. sales database did not contain the eight contested CONNUMs, but that the January 2011 U.S. sales database did. *Id.*

Jisheng, for its part, explained why it appeared that FOP data for the eight CONNUMs was not on the record. *See* Pl.'s Resp. to Supp. Questions, ECF Nos. 53–54. Jisheng asserted for the first time that the eight CONNUMs were reported in error and that Jisheng corrected those errors when it submitted a revised November 16, 2010 U.S. sales database. According to Jisheng, "[t]he sales previously associated with the eight contested CONNUMs are still included in the revised November 16, 2010 U.S. sales database in Exhibit SS-1, but are listed with corrected CONNUMs." *Id.* at 2. Jisheng attributes its errors to an alignment mistake in the "STYLEU" column of its U.S. sales database (referring to mushroom style, one of the

characteristics making up the CONNUM) that supposedly caused all of the CONNUMs to be off by one number. *See id.* at 6. Thus, the FOP database was purportedly complete without the eight contested CONNUMs, since those CONNUMs were incorrectly reported in the first place.

## II. Commerce reasonably applied the AFA framework to complete FOP data for the nine contested CONNUMS

### A. Framework for determinations on the basis of AFA

Commerce generally makes its antidumping determinations using information that it receives from interested parties over the course of an administrative review. However, if Commerce finds that a party has submitted a non-compliant response to a request for information, it "shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of" the review. 19 U.S.C. § 1677m(d). If after that opportunity Commerce has still "received less than the full and complete facts needed to make a determination," it must rely on facts otherwise available to complete the record. *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003); *see also* 19 U.S.C. § 1677e(a).

When selecting among the facts otherwise available, Commerce may use "an inference that is adverse to the interests of" the party providing the deficient information. 19 U.S.C. § 1677e(b). An adverse inference is available if Commerce finds that "an interested party has failed to cooperate by not acting to the best of its ability to comply with" Commerce's requests. *Id.* An interested party fails to act to the best of its ability when it does not "do the maximum it is able to do," regardless of motivation or intent. *Nippon Steel Corp.*, 337 F.3d at 1382–83. While this standard "does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate recordkeeping." *Id.* at 1382.

### B. Commerce reasonably applied AFA to complete Jisheng's FOP data for eight CONNUMs

Jisheng avers that it provided all the information that Commerce requested, including "all necessary FOP data for the eight CONNUMs at issue" in this case. *See* Pl.'s Mot. for J. on Agency R. ("Pl.'s Br."), ECF No. 22, at 11 (stating that it provided such information in its November 2010 and January 2011 responses). As a result, Jisheng maintains that it had no reason to notify the Department of its inability to provide information. *Id.* (citing 19 U.S.C. § 1677m(c) & (e)). Jisheng further submits that any remaining problems in the data (formatting or otherwise) stemmed from the Department's "unclear and confusing" instructions and rushed response timetables. *Id.* at 16.

Jisheng's assertion that it provided useable FOP data for the eight CONNUMs at issue is not substantiated by a review of the record. Based on the supplemental briefing in this case, it appears that Jisheng may actually be arguing that it provided FOP data for what the eight CONNUMs in the U.S. sales database should have been had they been correctly transcribed. Nonetheless, that argument is unavailing for several reasons.

First, although Jisheng maintained below that it provided all necessary information, it never described its purported transcription errors with the clarity that it does in the supplemental briefing before this court. Jisheng accordingly failed to exhaust its administrative remedies with regard to this claim. *See* 28 U.S.C. § 2637(d) (providing that the court "shall, where appropriate, require the exhaustion of administrative remedies").[2] However, even setting aside the exhaustion

---

[2] Although a desire for accuracy in calculating dumping margins may sometimes outweigh the interest of finality, *see, e.g.*, *NTN Bearing Corp. v. United States*, 74 F.3d 1204 (Fed. Cir. 1995), this is not such a case. Indeed, in *NTN Bearing Corp.*, the respondent alerted Commerce to errors prior to issuance of the final results. *Id.* at 1208. It appears that Jisheng *never* informed Commerce of the alleged errors. Further, Jisheng does not allege that its errors were so obvious that Commerce should have corrected them on its own. *See Alloy Piping Prods., Inc. v. Kanzen Tetsu Sdn. Bhd.*, 334 F.3d 1284, 1292–93 (Fed. Cir. 2003). In any event, Jisheng's attempt to make that argument at this stage would be improper, since it did not make that claim below. *Id.* at 1293 ("Of course, in such a circumstance, the respondent is required to exhaust its administrative remedies.").

issue, Jisheng's omission of the eight CONNUMs from its U.S. sales database was short-lived. Though the eight CONNUMs did not appear in Jisheng's November 2010 U.S. sales database, all eight appeared in the revised January 2011 U.S. sales database. *See, e.g.*, C.R. Doc. 38 at Ex. SSS-1, Lines 99–101, 105, 211, 221, 470, 1279.  It seems improbable that Jisheng would make errors, discover those errors, and later re-introduce the same errors.[3]  Indeed, Jisheng offers no record evidence supporting its assertion that the "corrected" CONNUMs more accurately reflect the physical characteristics of products sold in the United States during the POR.

Finally, even if this court credited Jisheng's belated assertion, Jisheng impermissibly shifts the burden of creating an accurate record onto Commerce.  While Commerce may be responsible for correcting certain obvious errors, it was not Commerce's duty to unearth non-obvious errors in Jisheng's databases.  *See QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) ("[T]he burden of creating an adequate record lies with [interested parties] and not with Commerce.'" (second alteration in original) (citation omitted)); *Societe Nouvelle de Roulements (SNR) v. United States*, 19 CIT 1362, 1368, 910 F. Supp. 689, 694 (1995) ("Respondents 'must submit accurate data' and 'cannot expect Commerce, with its limited resources, to serve as a surrogate to guarantee the correctness of submissions.'" (citation omitted)).

Without any evidence of a record exchange where Jisheng *unambiguously* explained that the eight CONNUMs were accidentally reported and not reflective of products sold in the United States during the POR, Commerce could have reasonably found that resorting to facts otherwise

---

[3] For example, Jisheng avers that the correct CONNUM for "OBSU" number 99 in the U.S. sales database is [[      ]]. *See* Pl.'s Resp. to Supp. Questions, ECF No. 53, at 4.  Although "OBSU" number 99 is associated with [[      ]] in the November 2010 response, Jisheng replaced that number with one of the eight contested CONNUMs—[[      ]]—in its January 2011 response. *Compare* C.R. Doc. 33 at Ex. SS-1, Line 99, *with* C.R. Doc. 38 at Ex. SSS-1, Line 99.  Additionally, even in the November 2010 response, the STYLEU line is still listed as [[      ]], which technically aggregates to [[            ]].

available was necessary to complete the FOP information. In the January 2011 final revised U.S. sales database, Jisheng included eight CONNUMs without corresponding FOP data. The only FOP data associated with those CONNUMS appeared in Jisheng's September 2010 submission, in which Jisheng included limited data for some of the eight CONNUMs. Yet, the September 2010 data was replete with formatting errors, inconsistent duplicates, and seeming logical impossibilities. 19 U.S.C. § 1677m(e) did not reasonably obligate Commerce to consider it.

Commerce also complied with its statutory duty to "promptly inform [Jisheng] of the nature of the deficiency" and afforded Jisheng "an opportunity to remedy or explain the deficiency." *See* 19 U.S.C. § 1677m(d). In its initial, first supplemental, and second supplemental questionnaires, Commerce requested FOP data for all the CONNUMs contained in Jisheng's U.S. sales database. *See* P.R. 36 at D-1; C.R. 19 at 6; C.R. 32 at 4. In its second supplemental questionnaire, Commerce additionally explained how Jisheng needed to revise its September 2010 FOP data and why the data was not useable in its present form. C.R. 32 at 4–7. In its subsequent preliminary results memorandum, Commerce numerically identified the eight CONNUMS for which it lacked useable FOP data. *See* C.R. Doc. 45 at 5. Jisheng again missed an opportunity to comprehensively explain in its case brief why the necessary FOP information was on the record, and instead continued to direct Commerce to its previous questionnaire responses. *See, e.g.*, C.R. 46 at 4–5 (maintaining that Jisheng submitted all necessary data "*including*" the data for the eight CONNUMs in question and that the CONNUMs in the U.S. sales database matched the CONNUMs in the FOP database).[4]

Lastly, an adverse inference was appropriate under these circumstances. Though Jisheng believes that it submitted all relevant data, it should have realized that Commerce did not agree.

---

[4] In its administrative case brief, Jisheng vaguely referred to inevitable "clerical errors" in its *initial* Section C database, but did not specifically identify the nature of those errors. *See* C.R. 46 at 4, 10. Moreover, it did not reference any clerical errors in its January 2011 Section C database.

If Jisheng had contacted Commerce (as Commerce repeatedly offered), Jisheng could have clarified what it now asserts—namely, that the eight CONNUMs were included in error. That would have helped Jisheng better understand what the Department sought and cleared up any confusion on the Department's end. Alternatively, Jisheng could have confirmed before submitting its responses that, as the Department requested, the CONNUMs in the U.S. sales database mirrored the FOP database. Had Jisheng done that, it might have corrected any error on its own and the discrepancy regarding the eight CONNUMs may have disappeared. Jisheng's failure to take either of these paths confirms that Jisheng failed "to do the maximum it [was] able to do" to accurately complete the record. *Nippon Steel Corp.*, 337 F.3d at 1382–83 (emphasizing additionally that § 1677e(b) does not require intentional misconduct). Accordingly, Commerce's decision to employ a statutory adverse inference was appropriate.

### C. Commerce reasonably applied AFA to complete FOP data for certain packing costs for one CONNUM

Jisheng also challenges Commerce's decision to apply partial AFA to complete packing costs for one of the CONNUMs in Jisheng's U.S. sales database. Jisheng claims that the necessary information is on the record, obviating the need to resort to facts otherwise available. Pl.'s Br. at 17–23.[5] Jisheng further avers that Commerce impermissibly delayed bringing the packing usage factor problem to Jisheng's attention. *Id.* at 22. According to Jisheng, it did the best it could given the demanding nature of Commerce's requests and the late stage at which Commerce requested the information. *Id.* at 23.

Again, it appears that Jisheng failed to adequately communicate with the Department regarding the CONNUM at issue. The court assumes (but cannot confirm since Jisheng has not clearly articulated this point) that Jisheng erroneously reported [[          ]] in its U.S. sales

---

[5] Jisheng spends time in its brief justifying its reporting of average canning costs. However, that argument seems irrelevant since the CONNUM at issue was not missing canning costs; it was missing packing costs.

database.  This assumption is based on Jisheng's assertion in its administrative case brief that Jisheng canned, but did not sell, CONNUM [[        ]] during the POR.  *See* C.R. 46 at 11.  Nonetheless, both Jisheng's November 2010 and January 2011 U.S. sales databases contain that CONNUM.  *See, e.g.*, C.R. Doc. 33 at Ex. SS-1, Line 783; C.R. Doc. 38 at Ex. SSS-1, Line 94.  Jisheng never attempted to explain why a CONNUM that it purportedly did not sell during the POR appeared multiple times in its U.S. sales databases.

Without that explanation, Commerce operated under the reasonable assumption that Jisheng sold the product associated with [[        ]] during the POR.  Thus, consistent with normal practice, Commerce sought FOP data for that CONNUM.  When Jisheng failed to report certain costs in September 2010, Commerce requested additional information regarding the apparent deficiency.  *See* C.R. Doc. 32 at 6.  In response, Jisheng explained that it [[

]], and that was why the FOP data for certain CONNUMs [[

]].  *See* C.R. Doc. 33 at 7.

In its January 2011 questionnaire, Commerce clarified that its "antidumping calculation methodology requires that a usage factor be attributed to *each FOP of each CONNUM*."  C.R. 36 at 5 (emphasis added).  Thus, Commerce extended Jisheng's reporting period for four CONNUMs to the year preceding the POR.  *Id.*  In so doing, Commerce hoped to obtain useable [[

]].

Commerce also instructed Jisheng to contact them if the proposed reporting method still resulted in [[                                                       ]].  *Id.*[6]

---

[6] The CONNUM at issue was apparently [[                        ]], during the POR while the other three similarly deficient CONNUMs were [[                ]].  It is unclear what Commerce hoped to gain by having

Jisheng ultimately did not provide packing usage factors for the CONNUM at issue and did not contact the Department to explain the basis for its failure. *See* C.R. Doc. 33 at Ex. SS-2, Worksheet 10 (showing zeroes for all packing usage factors); C.R. Doc. 38 at Ex. SSS-4, Worksheet 1 (same); C.R. Doc. 42 at Attach. B, Worksheet 8 (same). Since Jisheng should have realized that its continued failure to report packing usage factors conflicted with Commerce's instructions to report usage factors for each FOP of each CONNUM, it should have also known to contact the Department or otherwise provide that data.[7] Jisheng's decision not to exert that effort (or to correct its U.S. sales database, if that was the nature of the problem) demonstrates that it failed to do the maximum it was able to do. Therefore, Commerce adequately supported its decision to employ an adverse inference.

## **CONCLUSION AND ORDER**

The court recognizes that Jisheng expended significant effort in attempting to respond to Commerce's questionnaires. The court also acknowledges that errors of the type alleged in this case may inevitably occur. However, it was incumbent on Jisheng to clearly identify and explain the nature of those errors to Commerce. Without any record exchange of that nature, the court is not in a position to now opine about what Commerce should have done had it been presented with the necessary clarification.

In sum, "(1) the error[s] [were] made by [Jisheng]; (2) no request to correct the error[s] was made before the final determination; and (3) there [has been] no showing that the error[s] [were] apparent to Commerce (or should have been apparent) from the record or the final

---

Jisheng report the preceding year's data for [[        ]], since that product would not have been [[
            ]]. Nonetheless, the overall purpose of Commerce's supplemental question was clear: report usage information for "each FOP of each CONNUM" or contact the Department if unable to do so. C.R. 36 at 5.

[7] Although Jisheng generally complains that Commerce did not give the company enough time to provide the information, it does not appear that Jisheng relayed those concerns to Commerce or asked for an extension. Moreover, for the CONNUM at issue, Jisheng never reported any packing usage costs. Surely reporting nothing whatsoever cannot be the maximum Jisheng was able to do, even within a compressed timetable.

determination itself." *See Alloy Piping Prods., Inc. v. Kanzen Tetsu Sdn. Bhd.*, 334 F.3d 1284, 1293 (Fed. Cir. 2003).  In those circumstances, this court cannot require Commerce to belatedly amend its *Final Results* to account for newly-alleged errors.  *See id.*; *Chengde Malleable Iron Gen. Factory v. United States*, 31 CIT 1253, 1260, 505 F. Supp. 2d 1367, 1374 (2007).

    For the foregoing reasons, it is hereby ordered that Jisheng's Rule 56.2 Motion for Judgment on the Agency Record is **DENIED** and the *Final Results* are **SUSTAINED**.

                                                             /s/ Richard W. Goldberg
                                                          Richard W. Goldberg
                                                          Senior Judge

Dated:  August 23, 2013
        New York, New York